**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **LOUIS CASTRO PEREZ** | § | |
| | § | |
| **V.** | § | **A-09-CA-081 LY** |
| | § | |
| **NATHANIEL QUARTERMAN** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
         UNITED STATES DISTRICT JUDGE

The undersigned Magistrate Judge submits this Report and Recommendation to the District

Court pursuant to 28 U.S.C. §636(b) and Rule 1 of Appendix C of the Local Court Rules of the

United States District Court for the Western District of Texas, Local Rules for the Assignment of

Duties to United States Magistrate Judges, as amended.

Before the Court are Petitioner Louis Castro Perez's Amended Application for Writ of

Habeas Corpus under 28 U.S.C. § 2254 (Clerk's Docket No. 15),[1] Respondent Director of the Texas

Department of Criminal Justice Nathaniel Quarterman's Answer (Clerk's Docket No. 23) and

Petitioner's Reply Brief (Clerk's Docket No. 30).

**I. GENERAL BACKGROUND**

**A.      Factual Background[2]**

Michele Fulwiler ("Fulwiler"), a senior juvenile probation officer with Travis County

Juvenile Court, met Louis Castro Perez ("Perez") in 1997 while Fulwiler was dating one of Perez's

---

[1]Petitioner's Amended Application replaces Perez's Original Application for Writ of Habeas
Corpus.

[2]The Court has summarized the facts of the case based on the evidence presented at Perez's
capital murder trial in this case.

friends.  Fulwiler and Perez became friends and began an "on again/off again" casual romantic relationship which consisted of going out for drinks, hanging out at Fulwiler's house, drinking alcohol, snorting cocaine and having sex.  14 Tr. 231.[3]  In the Spring of 1998, Fulwiler and Perez ended their intimate relationship, but remained friends and continued to see each other socially.  15 Tr. 129.

On Tuesday, September 8, 1998, a month or so after the couple broke off their romantic relationship, Fulwiler telephoned Perez and invited him out to dinner.  At approximately 6:00 p.m., Fulwiler picked Perez up from his parents' house—where he was residing at that time—and the two went to a local bar and had a few drinks.[4] 15 Tr. 175.  After spending a couple of hours at the bar, Fulwiler and Perez went back to Fulwiler's house to watch television, talk, drink and snort cocaine.[5] 14 Tr. 209-210; 21 Tr. 110-120.  At approximately 11:30 p.m., Fulwiler's roommate and co-worker, Cinda Barz, returned to the house.  Barz's nine year-old daughter, Staci Mitchell ("Staci'), who also lived at the house, was already asleep in her room.  Shortly thereafter, Catherine Clayton, a friend of Fulwiler's,  arrived at Fulwiler's house.  Fulwiler had told Clayton earlier that day to stop by her house after Clayton's date that evening.  Clayton testified that Fulwiler and Perez —who both appeared to be intoxicated—were sitting in the living room, drinking beer and watching television.

---

[3]"Tr." refers to the official Court Reporter's Transcript of Petitioner's murder trial in the 299th Judicial District of Travis County, Texas.  The number preceding "Tr." refers to the volume number and the number following it refers to the page number.

[4]Perez had moved back into his parents' house after he was evicted from his apartment. 21 Tr. 174.

[5]Perez had brought the cocaine with him to sell to Fulwiler.  A friend of Perez's, Steve Jackson, had given Perez some cocaine the previous day, on Monday, September 7, 1998, so that Perez could sell the cocaine to "friends" while Jackson was out of town. 15 Tr. 134.

14 Tr. 214, 218.  After chatting with her friends for about an hour or so, Clayton said that Perez got up from the couch and went into Fulwiler's room, presumably to go to sleep.  Clayton left Fulwiler's house at approximately 1:00 a.m., on Wednesday, September 9th.  14 Tr. 222.

Perez testified that he and Fulwiler stayed up most of the night drinking and snorting cocaine. Perez stated that he did not have sexual intercourse with Fulwiler because "she did not want to."[6] At approximately 8:15 a.m., Fulwiler called her supervisor to inform him that she was sick and would not be showing up for work.  14 Tr. 242.  This was the last time Fulwiler was heard from. Friends and co-workers tried unsuccessfully to call and page Fulwiler throughout the remainder of the day. 14 Tr. 202, 203, 225.

Unlike Fulwiler, Barz did show up for work on Wednesday.  However, after her daughter, Staci, failed to telephone her that afternoon, as she routinely did, Barz became concerned and headed for home at approximately 5:00 p.m. 15 Tr. 18.  Earlier that day, Barz had made plans with a co-worker, Dana McBee, to bring Staci over to McBee's house after work so that Staci could sell her some items for a school fund raiser.  15 Tr. 29.  After Barz and Staci failed to show up at McBee's house, McBee called Barz at home and paged her, but Barz never responded.  15 Tr. 29-32.  Barz's boyfriend, Melvin Jones, was also unable to reach Barz that evening and began to worry since Barz did not usually stay out late on school nights.  15 Tr. 83-84.  Jones called his friend, Jerome Jones, and asked him to drive by Barz's house on the way home from work to check on Barz. 15 Tr. 91. Jerome arrived at the house at about 2:00 a.m. (on Thursday, September 10th).  Although both

---

[6]Perez had previously complained to friends that Fulwiler did not like to have sex after snorting cocaine.  15 Tr. 148.

Fulwiler and Barz's cars were in the driveway, noone answered the door. 15 Tr. 93.  After Jerome

relayed this news to Jones, Jones called 911. 15 Tr. 94.

Police officers arrived at Fulwiler's house at approximately 3:40 a.m. that same day and

discovered a gruesome scene.  As the officers entered the house, they found the body of Cinda Barz

—still in her work clothes—lying in a pool of blood in the hallway.  14 Tr. 163.  The autopsy

revealed that Barz had died from blunt force injuries, multiple incised wounds, and a skull fracture.

17 Tr. 76-77.  She had defensive wounds on both of her hands.  *Id.*  The body of Michelle Fulwiler

was found in the master bedroom; she also appeared to have been beaten to death.  Fulwiler's

autopsy showed that she had died of blunt force injures and ligature strangulation.  17 Tr. 79; 14 Tr.

57.  Fulwiler also had multiple incised wounds and lacerations on her head and scalp, as well as

defensive wounds on both hands.  Finally, the officers discovered the body of Barz's nine year-old

daughter, Staci Mitchell, who was found partially dressed and tied to her mother's bed with a pair

of pantyhose.  14 Tr. 165.  Staci's autopsy revealed that she had died from ligature strangulation.

17 Tr. 79.  At the time of their murders, Michelle Fulwiler was 30 years-old, Cinda Bartz was 38

years-old, and Staci Mitchell was nine years-old.  14 Tr. 5, 191.

At about 9:15 p.m. on Wednesday evening, approximately four hours after Barz was

murdered, Perez knocked on the apartment door of Minerva Hall, who lived in an apartment complex

near the Barton Creek Greenbelt, about one mile from Fulwiler's house.  16 Tr. 7.  Perez had met

Hall through a friend of his who lived in the same apartment complex.  According to Hall, when she

looked out her kitchen window to see who was at the door, she did not recognize Perez because he

was sitting down on her front porch, covering his face with his hands.  16 Tr. 13.  After Perez

identified himself, Hall opened the door to find Perez barefoot, disheveled, with several scratches

on his neck that were "deep and fresh." 16 Tr. 14, 17.  Perez told Hall that he had just been in an argument with his father and that he must have scratched his face while running down the Greenbelt. Perez asked Hall if he could spend the night with her and she obliged.  16 Tr. 14-15.  As Perez entered Hall's apartment, her son, Perry Hall, also noticed that Perez had several scratches on his hands and arms.  16 Tr. 15, 54

The next morning, on Thursday, September 9th, Perez asked Hall if he could stay a bit longer and Hall agreed.  16 Tr. 20.  When Hall returned to her apartment later that morning, Hall informed Perez that he would have to leave that afternoon but offered to give him a ride to wherever he needed to go. 16 Tr. 21.  After she returned from work that afternoon, Hall mentioned to Perez that she had just heard on the radio that there had been a triple homicide in the neighborhood, to which Perez replied: "Really? Where?" and then continued to watch television. 16 Tr. 26.  Hall then said to Perez, in jest, "I sure hope I don't see you profiled in tomorrow morning's news connected to this homicide." 16 Tr. 27.  They both laughed at that point and Perez told Hall in Spanish, "You're going to give me the evil eye." 16 Tr. 27.  Perez then asked Hall to drop him off at "Joe's Bakery" in East Austin.  Hall noticed several more scratches on Perez's face in the car ride over to East Austin.  16 Tr. 31.  As Hall approached Texas Discount Furniture on East Seventh Street, Perez asked Hall to drop him off in the parking lot.  Perez got out of the car – still barefoot – and walked toward the entrance of the furniture store.  16 Tr. 32.[7]

Perez's friend, Tommy Recio, was the manager of the furniture store.  Earlier that day, Perez had called Recio to ask if he could stay with him for a couple of days.  16 Tr. 63, 67.  Perez told

---

[7]The next day, Hall discovered that Perez was a suspect in the triple homicide and called the police to inform them that Perez had spent the night at her place.  16 Tr. 34-35.

Recio that he had been in a fight with his ex-wife and that she had hit him. [8]   16 Tr. 69.  Like Hall,

Recio noticed that Perez was barefoot and had several scratches on his face. 16 Tr. 70.  Recio agreed

to let Perez stay with him and the two friends spent the evening talking and watching television. 16

Tr. 74.  After arriving at work the next morning (on Friday, September 10th) Recio discovered that

Perez was a suspect in the triple homicide.  Recio then called his attorney, who in turn called the

police.  When Recio took the police back to his apartment later that morning, Perez was no longer

there. 16 Tr. 86.

After ruling out other potential suspects in the case, police began to narrow in on Perez after

discovering that he was the last person to be seen with Fulwiler.[9]  After discovering that the bloody

palm print found next to Barz's body matched Perez's finger prints (which were already on file with

the Austin Police Department) police issued a warrant for Perez's arrest just before the 10:00 p.m.

nightly news on Thursday, September 9, 1998.  The police arrested  Perez at 6:30 p.m. on Friday,

September 10, 1998, at a South Austin convenience store. 16 Tr. 110, 188.  Perez alleged that he was

on the phone with his attorney at the time he was arrested.  Police also observed scratches on Perez's

face, neck, chest, arms and hands at the time he was arrested.  16 Tr. 192-94.

**B.    Perez's Trial**

The State introduced evidence from a number of witnesses linking Perez to the triple

homicide.  The State's blood spatter and crime scene reconstruction expert, Tom Bevel, testified as

---

[8]Perez's ex-wife denied that she had an argument with Perez and testified that she had not
seen or talked to him for almost two years prior to the time period at issue. 16 Tr. 95.

[9]For example, police interviewed and searched the house of Cinda Barz's boyfriend, Melvin
Jones, but found no evidence tying him to the murders.  In addition, Barz's ex-husband, Joe Mitchell,
had a solid alibi since he was in jail at the time the murders took place. 16 Tr. 169.

to how he believed the victims were killed.  First, Bevel testified that the evidence supported the conclusion that Fulwiler had been the first victim killed.  Bevel stated that Fulwiler's injuries revealed that she had struggled for some time with her attacker before being beaten and strangled to death. 18 Tr. 109.  Bevel testified that the killer remained in the house for several hours and was still there when Staci returned from school that afternoon. 18 Tr. 112.  The evidence shows that Staci received several blunt force blows to her face before she was strangled to death with a pair of pantyhose and tied to her mother's bed post.  18 Tr. 113-114.  Bevel testified that Barz was killed after she returned home from work that day at approximately 5:30 p.m.  18 Tr. 115.  He stated that the evidence at the scene showed that Barz had struggled with her attacker and had attempted to flee but that she had been repeatedly beaten with an iron skillet until she died.  18 Tr. 116-132.  Bevel also testified that finger and palm prints found in the blood stains near Barz's body were created approximately two to five minutes after Barz began bleeding.  18 Tr. 135.

Bevel futher testified that evidence at the scene suggested that the murderer knew the victims.  For example, it appeared that the killer had stayed in the house for a long period time after the first murder and the killer had used convenient items already present in the house as weapons.  In addition, the attacker had covered up the bodies of Fulwiler and Barz with blankets and had closed the door to the room where Staci's body was found.  18 Tr. 109-10, 142-43.

The State's fingerprint examiner testified that the bloody palm print found next to Barz's body matched the palm print of Perez's left palm.  18 Tr. 207.  In addition, there were numerous fingerprints lifted at the scene that matched Perez's prints.  Moreover, DNA found underneath Staci Mitchell's fingernails was consistent with Perez's DNA. 19 Tr. 44-45.  Similarly, Perez could not be excluded from contributing to the DNA found underneath Barz's fingernails. 19 Tr. 48-51.  DNA

on the towel found next to Barz's body was consistent with Perez's DNA. 19 Tr. 36.  In addition,

the rag wrapped around the knife found on the kitchen table was also consistent with Perez's DNA.

The crime scene reconstruction expert also testified that the scrapings found underneath the victims'

fingernails were consistent with the scratches found on Perez's face, neck and arms when he was

arrested. 19 Tr. 137.

The trial testimony also revealed that Perez failed to show up for two separate construction

jobs on the morning of September 9th.  Perez's friend, Steve Jackson, who had supplied Perez with

the cocaine he and Fulwiler had used on the night of September 8th, testified that Perez never showed

up to perform carpentry work at a client's house on Wednesday September 9, 1998, as he had said

he would.[10]  Jackson testified that he paged and called Perez several times that morning but was

unable to reach Perez.  15 Tr. 137.[11]  Perez also failed to show up for an important construction job

at Barton Creek Mall later that morning as well.  22 Tr. 220.  Mike Farsi, the owner of the

construction company who had hired Perez, testified that Perez failed to show up for work that day

and that he was unable to get a hold of Perez on September 8th and 9th.  Farsi also testified that Perez

had been anxious to begin work on the job since he needed the money.  15 Tr. 225.

Perez took the stand in his own defense and testified that he was innocent of the charges

against him.  Although Perez admitted that he had spent the previous night at Fulwiler's house, he

testified that he had left her house the next morning at about 8:00 a.m. and never saw again.  He

testified that he had asked Fulwiler to borrow some money but that after he began looking through

---

[10]While Perez did not have a regular job, he occasionally worked in the construction industry.

[11]Jackson stated that he also called Fulwiler's house and paged her, but was not able to reach her as well. 15 Tr. 138-139.  Jackson also called Perez's parents house who told him they did not know where Perez was. 15 Tr. 141.

her wallet, she told him that she would give him some money later.  Perez stated that after leaving

Fulwiler's house, he walked to a nearby convenience store and called a drug dealer named Alex

Gutierrez.[12]  21 Tr. 217, 234.  Perez testified that he had a piece of paper with Gutierrez' phone

number on it in his jeans pocket.[13]  Perez testified that after Gutierrez picked him up from the

convenience store, he hung out with Gutierrez the rest of the day, driving around, doing drug deals

and hanging out at Zilker Park "drinking beer, snorting cocaine, bullshitting and watching pretty girls

play volleyball."  21 Tr. 134.  Perez stated that Gutierrez dropped him back off at the convenience

store at approximately 5:00 p.m., at which point he bought some cocaine from Gutierrez and

proceeded to walk back to Fulwiler's house. 21 Tr. 138.

Perez testified that after he arrived back at  Fulwiler's house, he noticed that Fulwiler and

Bartz' cars were still in the driveway.  Before entering the house, Perez said that he took off his shirt

and shoes because "it was hot" and he wanted to take a shower.  Perez testified that he then opened

the door to find Barz lying on the floor with her arms in the air, gasping and choking.  21 Tr. 140.

Perez alleges that he then threw his shirt and shoes on the floor and approached Barz who then

grabbed/scratched him and then "went limp."  21 Tr. 140-141.  Perez said that he then grabbed his

---

[12]Perez testified that Alex Gutierrez was an acquaintance of his who he had only met on two previous occasions.  Perez stated that he originally met Gutierrez several months before the murders while Perez was in a public restroom of a local restaurant.  Perez testified that Gutierrez had approached Perez in the bathroom and offered him some cocaine.  Perez stated that he ran into Gutierrez a second time in the parking lot of an East Austin bar about a week before the murders. Perez stated that he was having a beer with his friend, Richard Mojica, when Gutierrez allegedly pulled into the parking lot and motioned for Perez to come over to his car.  When Perez approached his car, Gutierrez allegedly handed Perez a piece of paper with his phone number on it and told Perez to call him some time. 21 Tr. 210-211.

[13]Notably, however, when Perez was arrested, the police did not find the piece of paper in his pocket. 21 Tr. 307.  Perez said that he did not know where Gutierrez lived or how he could be contacted.

shirt (leaving his shoes) and fled the scene. 21 Tr. 270. Perez said that he did not call 911 because "I just didn't want to be involved." 21 Tr. 276. Perez explained that he wanted to avoid the police since there was a warrant out for his arrest (for failure to pay child support) and he was in possession of cocaine at the time. 21 Tr. 141.

After leaving Fulwiler's house, Perez claims that he walked around aimlessly until he arrived at Minerva Hall's apartment. 21 Tr. 149. Perez said that he did not tell Hall about what he had just seen because he did not want to get her involved. Perez testified that he did not find out he was a suspect in the case until the next day when he was at his friend Recio's house watching television. 21 Tr. 148.

Perez also testified about his past legal problems. He admitted that he repeatedly has failed to pay child support for his four children and that he was incarcerated for failing to comply with court orders directing him to pay child support. 21 Tr. 88-89. Perez also admitted that he routinely hid from authorities to avoid being arrested and changed jobs in an attempt to avoid wage garnishment. 21 Tr. 160, 167. Perez also admitted that he used marijuana and cocaine on a regular basis from 1993 to 1998 and that he had sold drugs in the past. 21 Tr. 90-91.

## C.    The Verdict and Subsequent Appeals

On September 23, 1999, the jury in the 229th District Court of Travis County, Texas convicted Perez of the offense of Capital Murder for the murders of Barz, Mitchell and Fulwiler. Pursuant to the jury's answers to the special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure, the trial judge sentenced Petitioner to death. The Court of Criminal Appeals affirmed Perez's conviction and sentence on direct appeal and the United States Supreme Court denied *certiorari*. *Perez v. State*, slip op., No. AP-73,738 (Tex. Crim. App. May 29 2002), *cert.*

*denied*, 546 U.S. 962 (2005).  Pursuant to Article 11.071, Perez filed a State Application for Writ of Habeas Corpus, which the Court of Criminal Appeals subsequently denied.  *Ex Parte Perez*, slip op., No. WR-56,440-01 (Tex. Crim. App. Oct. 8, 2008).  Having exhausted his State Court remedies, Perez filed the instant writ of habeas corpus, pursuant to 28 U.S.C. § 2254.

## II.  ISSUES PRESENTED

In his petition Perez asserts fifteen separate claims.  The claims are:

Claim Number One:  The State violated Perez's right to Due Process under the 14th Amendment to the United States Constitution by creating a false impression that the Texas prison system was excessively violent and that Perez would likely engage in violence if assessed a life sentence.

Claim Number Two:  Perez received ineffective assistance of counsel at trial resulting from trial counsel's failure to object to irrelevant testimony by the State's prison's condition witness, Royce Smithy.

Claim Number Three:  Perez received ineffective assistance of counsel at trial resulting from trial counsel's failure to request a proper limiting instruction on Royce Smithy's objectionable comment on Perez's peaceable nature in the Travis County Jail pending trial.

Claim Number Four:  Trial counsel rendered ineffective assistance of counsel during the punishment phase of trial by failing to challenge the State's future dangerousness evidence through the use of a violence risk assessment expert.

Claim Number Five:  Trial counsel rendered ineffective assistance of counsel during the guilt-innocence phase of trial by failing to call witness Richard Mojica to corroborate a portion of Perez's alibi defense.

Claim Number Six:  Trial counsel rendered ineffective assistance of counsel during the guilt-innocence phase of trial by failing to impeach witness Steve Jackson with a prior inconsistent statement made before the Grand Jury.

Claim Number Seven:  Trial counsel rendered ineffective assistance of counsel during the guilt-innocence phase of trial by failing to object to testimony by the State's crime scene reconstructionist that was outside his expertise.

Claim Number Eight:  Perez was denied the effective assistance of counsel when his attorney failed to object to a blood spatter expert's testimony about psychological matters that were beyond the scope of the witness' expertise.

Claim Number Nine:  The trial court erred in failing to grant Perez's challenge for cause to veniremember Hertel.

Claim Number Ten:  The trial court erred in granting the State's challenge for cause to veniremember Falbo.

Claim Number Eleven:  The trial court erred in failing to grant a motion for new trial after a bystander outburst during the guilt-innocence phase of the trial.

Claim Number Twelve:  The trial court erred in failing to sustain Perez's objection to the State's comment on Perez's right to remain silent.

Claim Number Thirteen:  The trial court erred in failing to instruct the jury at punishment regarding parole eligibility.

Claim Number Fourteen:  Mr. Perez is actually innocent of the offense.

Claim Number Fifteen:  The DNA investigation into the instant case needs to be entirely redone because of new and expanding technology.

### III.  STANDARD OF REVIEW

Perez's federal habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).  Under the AEDPA, a habeas petitioner may not obtain relief with respect to any claim that was adjudicated on the merits in a state court proceeding unless he shows the prior adjudication "(1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the first prong, a decision is contrary to "clearly established federal law," if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable" application of clearly established Supreme Court precedent if the state court "correctly identifies the correct governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410. Thus, as the Supreme Court has recently explained, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, – U.S.– , 130 S.Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 411). "Rather, that application must be 'objectively unreasonable.'" *Id.* Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Id.* (internal citations omitted).

In order to establish that habeas relief is warranted under the second prong—that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings—"a petitioner must rebut by clear and convincing evidence the § 2254(e)(1) presumption that a state court's factual findings are correct." *Foster v. Johnson,* 293 F.3d 766, 776-77 (5th Cir. 2002), *cert. denied*, 537 U.S. 1098 (2003). *See also*, 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a

13

State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

Finally, a petitioner must exhaust his remedies in State court prior to seeking federal habeas relief. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); 28 U.S.C. § 2254(b)(1). A petitioner has exhausted his claim when he has fairly presented the claim for which he seeks relief to the highest court of the State. *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## IV.  ANALYSIS

### A.    DUE PROCESS CLAIM

In his first point of error, Perez alleges that the State violated his rights to due process under the Fourteenth Amendment by offering false and misleading testimony from prosecution witness Royce Smithey regarding the extent of violence in the Texas prison system.

During the punishment phase of Perez's trial and in accordance with the Texas Code of Criminal Procedure, the jurors were asked to answer the special issue of whether there was a probability that Perez would commit criminal acts of violence that would constitute a continuing threat to society. See Tex.Code Crim. Proc. Ann., Art. 37.071 (Vernon 2006). This special issue relates to whether the defendant will "more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society *whether in or out of prison*." *Muniz v. State*, 851

S.W.2d 238, 250 (Tex. Crim. App. 1993) (emphasis added), *cert. denied*, 510 U.S. 837 (1993).  In support of its argument that Perez would constitute a continuing threat to society if he was imprisoned, the State offered the testimony of Royce Smithey, an investigator with the Special Prison Prosecutions Unit.  Smithey testified generally about inmate violence within the Texas prison system and the State's difficulty in controlling such violence.  Perez alleges that Smithy's testimony was false and misleading "as a result of his exaggeration of the quantity and quality of the violence within the TDCJ-ID system, his under-explanation of TDCJ-ID's classification and administrative segregation system, and his omission of details which would have been necessary to place his testimony regarding the prison system in proper perspective." Perez's Amended Petition at 19-20.

      1.     **Summary of Smithey's Testimony**

In support of his contention that Smithey's testimony was false and misleading, Perez relies on an affidavit from Dr. Mark Cunningham, a forensic psychologist, who takes issue with much of Smithey's testimony.  Cunningham first contends that Smithey overstated in absolute numbers the instances of assaults committed within TDCJ-ID on staff and other inmates.  Smithey testified that Texas prisons were inherently violent and testified that there were 1,700 inmate-on-staff assaults and 1,600 inmate-on-inmate assaults within TDCJ-ID in the year 1998.  Cunningham complains that Smithey's figures were erroneous because statistical data from TDCJ shows that there were actually only 1,510 inmate-on-inmate assaults and 1,442 inmate-on-staff assaults in TDCJ-ID in 1998.  In response to Cunningham's criticism, Smithey submitted an affidavit to the CCA, in which he stated the following:

> The numbers that I used in this testimony were obtained from the Emergency Action Center, Texas Department of Criminal Justice . . . which is in fact the same location that Mr. Cunningham's numbers came from.

I testified that there were 1700 assaults on staff members in1998.  The EAC report listed 1,674, not the 1,442 that was reported by Mr. Cunningham.  His figures came from the total assaults on offenders in 1997.

I testified that there were 1600 inmate assaults on inmates in 1998.  The EAC report listed 1,510 offenders assaults and 89 alleged sexual assaults, for a total of 1599.  Mr. Cunningham did not add in the sexual assaults and obviously did not feel that sexual assaults were assaults on the offenders.

When I testified to these numbers I rounded them off. I was not trying to give a specific number, but just wanted the jury to have an understanding of the amount of violence in the prison in that given year.  To the best of my memory, I did not have these figures in hand at the time of my testimony and was relying on my memory. My intention was not to mislead anyone for any reason. I did not intentionally misrepresent these numbers, exaggerat[e] the information or give the jury a misconception of the actual amount of violence in the prison system.  As you clearly see, I was only off by one (1) offender assaults and twenty six (26) on the employee assaults, as compared to Mr. Cunningham's misrepresentation of employee assaults (off by 232).

II SHCT 558.[14]

Cunningham further contends that Smithey's testimony regarding the incidents of violence within TDCJ was "substantially misleading because it did not place these numbers in context to the absolute prison population."  For example, Cunningham points out that Smithey failed to mention the total Texas prison population when he discussed the number of assaults in Texas' prisons. Cunningham explains that although there were 3,184 assaults which took place in Texas' prisons, that figure only accounted for 2.2 percent of the total inmate population since there were 144,119 inmates in Texas in 1998.  Similarly, Cunningham noted that Smithey failed to acknowledge that the homicide rate in the prison population in 1998 was quite low, about 4.16 per 100,000 inmates, and in fact was lower than the rate in the outside community.  Cunningham also points out that Smithey

---

[14]"SHCT" refers to the First Supplemental Transcript of the State Habeas Court Proceedings, with the volume number preceding and the page number following.

failed to note in his testimony that inmate-on-staff homicide was "extraordinarily rare" and averred

that there had not been a correctional officer killed by an inmate in Texas in more than 17 years.  In

response to these criticisms, Smithey explained his testimony as follows:

> I am not a statistician, nor do I use numbers to reach a conclusion.  The accusations of misleading and false testimony because I did not tell the jury the frequency of assaults in relations to inmate population are completely erroneous.  I do not have that information, I have not seen that information, or have any idea where that information comes from. According to the EAC report, you can clearly see an increase of staff and inmate assaults in correlation to the growth of population from 1995 to 1999.  I was not asked that question and I am not sure that I would have had that information available at the time I was on the witness stand.

> The 1998 population of TDCJ was 143,085 (Attachment #1), not 144,119 as report[ed] by Mr. Cunningham. Again, I'm not sure where Mr. Cunningham is getting his numbers, but they are not correct. Mr. Cunningham states "multiple assaults **may** have been perpetrated by the same offenders thus reducing the percentages of inmate assault." He does not know, yet will accuse me of misleading and giving false testimony.

> The fact that there were 6 murders in TDCJ in 1998, does not mean that my testimony was misreading or false.  Mr. Cunningham's research does not reflect how many of the assaults were of such a serious nature that person(s) could have died from the injuries. I deal with the known facts and not speculation.

> Mr. Cunningham highlighted in his affidavit that "it had been 17 years since a correctional officer had been killed by an inmate..." The fact is, Correctional Officer Daniel Naglel was killed by offender Daniel Lynn Pruett at the McConnell Unit in Bee County Texas on December 17, 1999, just days before my testimony in this case. Mr. Cunningham's research did not reflect this information in his affidavit.

> Mr Cunningham has compared the statistics of prison violence with the statistics of non-prison society. This is comparing apples and oranges. The prison is a controlled environment and violence should be lower in the prison than it is in society. That does not mean that there is no violence and that the jury should not hear about what type of violence there is in prison.

II SHCT 559.

Cunningham next argues that Smithey misled the jurors by exaggerating the freedom enjoyed by "general population inmates." Smithey testified that TDCJ-ID officials had little control over the conduct of inmates who were not on death row. He further stated that Inmates within the "general population" had the freedom to come and go, to go to work, to eat, to recreate" and "pretty much have the—the run of the entire inside of the prison." Cunningham complains that Smithey referred to the "general [prison] population" without explaining to the jurors that there are several security classifications within that system. Cunningham explains:

> The fundamental issue, not acknowledged by Mr. Smithey, is that TDCJ appraises the threat that each inmate represents and assigns them to a security classification within TDCJ that corresponds to that assessment. Again, TDCJ is not apathetic, inept, or incompetent in this classification function. Mr. Smithey mischaracterized the non-death row experience of TDCJ inmates as unstructured, self-directed, and exceptionally violent.

Cunningham Aff. at 22-23. In response, Smithey explained his testimony as follows:

> My testimony simply stated that the offenders in the general population have the freedom to go from one place to another inside the prison unit. They are responsible for getting to the dining hall, work, school, church, etc., without the escort of an officer. This testimony is giving the jury an understanding of how the offenders have more free movement in general population than offenders that are housed in administrative segregation or death row. Offenders are housed in different locations with different restrictions depending on their disciplinary history while incarcerated in the prison as was explained throughout my testimony. This testimony is not misleading or erroneous because that is the way the prison operates. Again I am trying to give the jury information about how the prison works not trying to infer that Mr. Perez should be placed on death row.

> . . .my testimony stated that "Texas probably does the best of any prison in the United States for controlling violence, but yet we're still a violent society." Also I testified . . . "that if an individual wants to be violent he can,. . ." I am simply saying that you cannot control a person twenty four hours a day, seven days a week to keep them from being violent, if they choose to be.

II SHCT 560.

18

Cunningham further contends that Smithey's testimony misstated the ability of TDCJ-ID's classification and administrative segregation facilities to control violence within the prison system. Smithey testified that TDCJ-ID's system of placing troublesome or violent inmates within administrative segregation was only a temporary means of limiting violent inmates and that the Texas prison system was "still a violent prison . . . [with] just no way to control it." Cunningham complains that Smithey failed to state that there were 8,000 administrative segregation cells in TDCJ and that the majority of inmates in these cells are single-celled and thus are isolated from physical contact with other prisoners. In addition, he points out that Smithey failed to note the numerous restrictions on prisoners located in administrative segregation such as being "locked down" for 23 hours a day and being shackled when being removed from their jail cells. In response, Smithey explained:

> Again, my testimony reflected that TDCJ does a great job, but if a person chooses to be violent, they will be. That is the bottom line and that is what my testimony reflects. Mr. Cunningham wants to infer that I am trying to hide something when it comes to Administrative Segregation. . . . I testified to the general workings of Administrative Segregation. I testified to what it is and how TDCJ uses it for offenders that are a security threat. That includes offenders that have committed acts of violence while incarcerated.

> Mr. Cunningham's affidavit stated "that in 1998 there were 8,000 administrative segregation cells in TDCJ." The number of cells or beds were not asked and I did give a complete description of the restriction that offenders have in administrative segregation. Thus I gave the jury an accurate and truthful answer.

II SHCT 560-61.

Finally, Cunningham argues that Smithey understated the administrative procedures utilized by TDCJ-ID to address prison gangs. Smithey testified that TDCJ-ID had a sizeable number of inmates who belonged to prison gangs who used fear and violence against other inmates to exert

control and to obtain "drugs [and] sex." [Vol. 23 RR: 16 - 17].  He testified that TDCJ-ID also had

numerous "cliques" which could become "disruptive" within the prison system.  Cunningham

complains that Smithey failed to acknowledge that in 1998, TDCJ had taken effective steps to

control prison gangs by ordering the indefinite administrative segregation lock down of over 5,000

known prison gang members.  In response to these criticisms, Smithey stated the following:

> I was asked if there are gangs in the penitentiary, their organization and activity and
> why someone would join a gang. My testimony. . .gave a general overview of the
> prison gangs and their activity. The information given in this testimony is from
> working closely with the Bureau of Classification for the previous 14 years and being
> instrumental in continuously giving them gang information obtained from court
> testimony and witness and informant information.  I worked closely with TDCJ in
> the mid 1980's in the identification of gangs within the prison. This knowledge
> comes from hands on work, observation and the collection of information, not from
> a book, magazine or a research paper.

II SHCT 561.

## 2.      Did the testimony violate Perez's due process rights?

The Due Process Clause of the Fourteenth Amendment forbids the government from

knowingly using, or failing to correct, false testimony. *See Giglio v. United States*, 405 U.S. 150,

153, (1972);  *Napue v. Illinois*, 360 U.S. 264, 271(1959).  In order to prove that his right to due

process was violated by the use of perjured testimony, Perez must show (1) the actual falsity of

Smithey's testimony, (2) that the prosecution knew the testimony was false, and (3) that the

testimony was material.  *See Giglio,* 405 U.S. at 153-54; *United States v. Mason*, 293 F.3d 826, 828

(5th Cir. 2002).

The State Habeas Court found that Perez's due process rights were not violated by Smithey's

testimony because he failed to demonstrate that Smithey's testimony was perjured:

> [The] Applicant has not shown that Royce Smithey's testimony was false or misleading.  At best, the applicant has shown minor variations in the statistics offered by Smithey and those offered by his own expert on habeas, Dr. Mark Cunningham.  He has not demonstrated that Mr. Smithey perjured himself in offering this testimony or that the State knowingly offered perjured testimony in calling Mr. Smithey.

Findings of Fact, Conclusions of Law, at p. 3.  Under the applicable standard, to obtain relief on this claim Perez must demonstrate that the State Court's rulings on this issue were objectively unreasonable.

Perez has failed to meet this burden.  He has not demonstrated that Smithey's testimony was false, that the State  knew the testimony was false, and that the testimony was material.  *See Giglio*, 405 U.S. at 153-54;  *Mason*, 293 F.3d at 828.  As the State Habeas Court found, at best, Perez has only pointed out minor inconsistencies and errors in Smithey's testimony. "Minor inconsistencies within and among prosecution witnesses is no indication of intentional falsehood." *Ciaprazi v. Senkowski*, 2003 WL 23199520 at * 10 (E.D.N.Y. Dec. 5, 2003), *cert. denied*, 547 U.S. 1209 (2006). *See also, United States v. Naranjo*, 2009 WL 301839 at * 8 (5th Cir. Feb. 9, 2009) (holding that petitioner did not meet his burden of proof to show perjury where petitioner only pointed to minor inconsistencies in the witness' testimony that were not material to his guilt);  *United States ex rel. Blumenberg v. Frey*, 2005 WL 326976, at *2 (N.D. Ill. Feb.9, 2005) ("At most, the discrepancies in [witness's] testimony went to the weight of his testimony. It is the province of the trier of fact to resolve conflicts in testimony and to make credibility determinations").

Moreover, Perez has failed to show that the State knowingly used perjured testimony in this case.  Perez has not established that the State knew that Smithey was lying and, in spite of that knowledge, offered his testimony.  *See Avery v. Procunier*, 750 F.2d 444, 448 (5th Cir. 1985) (denying due process claim where petitioner failed to show that state knowingly used perjured

testimony).  The prosecutors in Perez's trial, Howard "Buddy" Meyer and Clare Dawson-Brown, submitted a joint affidavit in the State Habeas proceedings, in which they testified that at the time of Perez's trial, they had no reason to think that Smithey's testimony was in any way false or misleading or that his statistics were in any way inaccurate. *See* II SHCT 456.  They averred that the State had no intention of offering false or misleading testimony in Perez's case.  Perez has failed to demonstrate that the prosecution team intended to offer false or misleading testimony in this case.

Finally, Perez has failed to show that these minor statistical errors were material.  "Perjury is material, and a new trial is required 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir.1998) (quoting *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993)), *cert. denied*, 526 U.S. 1148 (1999).  Perez has failed to show that the minor errors in Smithey's testimony "played a crucial, critical, and highly significant role" in the punishment phase of the trial. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999).  As the State Habeas Court concluded, "in light of the extraordinary violent nature of the offense on trial and the punishment phase testimony from the victim's family members, [Perez] has not demonstrated that Mr. Smithey's testimony about TDCJ demographics was material or that applicant was actually harmed by this testimony."  Findings of Fact, Conclusions of Law at p. 3;  *See e.g., Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir.) ("Even if expert's testimony regarding defendant's future dangerousness was misleading, there was not a reasonable likelihood that its correction would have affected the jury's verdict in capital murder trial, and thus, habeas relief was not warranted, where, prior to expert's testimony at punishment phase, defendant had been convicted of brutal rape and strangulation of 77-year-old woman, and additional evidence presented at sentencing phase included rape of his

ten-year-old stepdaughter, lengthy criminal history, and evidence of repeated escapes from incarceration)*, cert. denied.*, 525 U.S. 940 (1998).  Accordingly, Perez has failed to show that his due process rights were violated by Smithey's testimony.  Perez has failed to demonstrate that the State Court's rulings on this issue were objectively unreasonable.

## B.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel," that is representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To obtain habeas relief on grounds of ineffective assistance, a petitioner must show *both* that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.  *Strickland,* 466 U.S. at 687.  To demonstrate deficiency, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  In analyzing counsel's performance, courts must make every effort to "eliminate the distorting effects of hindsight," *Id.* at 689, and must not assume that counsel's performance is deficient "merely because we disagree with trial counsel's strategy." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir.)*, cert. denied.*, 528 U.S. 947 (1999).  To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  "In assessing prejudice, courts 'must consider the totality of the evidence before the judge or jury.'" *Berghuis v. Thompkins*, – U.S. – , 130 S.Ct. 2250, 2265 (2010) (quoting *Strickland*, 466 U.S. at 695).

### 1.      Failure to object to Royce Smithey's testimony

Related to his due process claim, Perez argues that he received ineffective assistance of counsel when his trial counsel failed to object to Royce Smithey's "irrelevant testimony" regarding the violent nature of the State's prison system.  Perez contends that Smithey's testimony was not relevant to the future dangerousness issue because his testimony was not specifically tailored to Perez individually and failed to "give any particularized testimony regarding Mr. Perez's probability of committing acts of violence within the prison system." Perez's Amended Application at p. 29. Thus, Perez argues that his trial counsel should have objected to Smithey's testimony on the ground of relevance.

The State Habeas Court found that Perez's trial counsel were not ineffective for failing to object to Smithey's testimony regarding prison conditions since Smithey's testimony was relevant and admissible.  In addition, the Habeas Court pointed out that "when Smithey began to veer outside the area of relevant and admissible testimony, defense counsel raised a relevance objection, which was sustained by the Court."  Findings of Fact and Conclusions of Law at p. 3.  While Perez's defense attorneys did not make a *general* objection to Smithey's testimony based on relevance, Perez's lead defense attorney, Joe James Sawyer, did in fact raise an objection to Smithey's testimony.  In response to the prosecutor's question of whether Smithey would be surprised to learn that Perez had not received any disciplinary action while he was incarcerated in Travis County Jail, Smithey replied:  "Would that surprise me?  If I was on trial for Capital Murder, I wouldn't want anything to be used against me."  23 Tr. 22-23.  Sawyer immediately objected stating, "What does this have to do with his expertise in a prison population?  That opinion is no more valuable than a

24

wino on the streets." 23 Tr. 23.  After the trial court sustained the objection, the State and Defense

stated that they had no further questions for Smithey and he was excused from the witness stand.

Perez's trial counsel, Joe James Sawyer and Berkeley Bettis, both provided sworn testimony

to the CCA during the state habeas proceeding explaining that they had not objected to the entirety

of Smithey's testimony due to trial strategy.  Counsel explained that they did not believe Smithey

was an effective prosecution witness and thus decided not to make a general objection to his

testimony.  In fact, Mr. Bettis testified that Smithey's testimony actually helped the defense because

his testimony had a negative impact on the jury due to his "unprofessional appearance, obvious bias,

and truly incredible trial testimony." II SHCT 530.  In addition, Mr. Sawyer testified that he did not

object to Smithey's testimony on the basis of relevance because he could see no benefit to such an

objection.  Sawyer explained that his objection that Smithey's testimony was "no more valuable than

a wino on the streets" effectively dealt with Smithey's irrelevant comments. I SHCR 159.  Sawyer

further stated that he believed that it would have been poor trial strategy to further object to

Smithey's testimony on relevance or to cross-examine him at this point because "the emotional

impact on the jury was such that it would be gilding the lily to ask for more." I SHCR 159.  Sawyer

further elaborated:

> I think two or three members of the jury in a very terrible trial actually laughed.  I do
> remember watching Smithey walk out of the courtroom and I thought I had never
> seen a more woebegone looking figure.  He was as bright red as a human being can
> achieve without exploding.

I SHCR 159.  Bettis added that Sawyer's "wino" comment was "one of the high points of my legal

career" and noted that "if this was ineffective assistance, I wish I could have done as poorly on many

other occasions." Bettis Affidavit at p. 2, II SHCT 530.

Based upon the foregoing, the Court finds that it was sound trial strategy for Perez's attorneys to have not further objected to Smithey's testimony. First, the Court notes that objecting to the entirety of Smithey's testimony on prison conditions in Texas as irrelevant would have been a futile objection. As noted above, the future dangerousness special issue asks the jury to determine whether the defendant is a continuing threat to society "whether in or out of prison." *Muniz v. State*, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 827 (1993). Courts have specifically found that testimony regarding the violent nature of prison in Texas is relevant to the issue of future dangerousness. *See Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008), *cert. denied*, 129 S.Ct. 80 (2009) ("The trial court did not abuse its discretion to decide that Smithe[y]'s testimony that inmate violence can occur under current prison conditions had some relevance to, and would have aided the jury in determining, appellant's future dangerousness..."), *habeas granted on other grounds in Ex parte Lucero*, 2010 WL 3582978 (Tex. Crim. App. Sep 15, 2010). *See also*, *Ramey v. State*, 2009 WL 335276 at * 14 (Tex. Crim. App. Feb 11, 2009), *cert. denied*, 130 S.Ct. 81 (2009) (citing *Lucero* and holding that Smithey's testimony "regarding general prison conditions is both relevant and permissible"); *Canales v. State*, 98 S.W.3d 690, 699 (Tex. Crim. App. 2003) (holding that testimony of defense witness at punishment phase of capital case that he had heard of inmates defeating the locking mechanisms on doors in "administrative segregation" units was relevant and admissible on the "future dangerousness" special issue), *cert. denied*, 540 U.S. 1051 (2003). Because Smithey's testimony regarding the violence in the Texas prison system was relevant to the issue of future dangerousness, any objection by defense counsel would have been futile. *See Solomon v. Livingston*, 2005 WL 997316 at * 7-8 (E.D. Tex. March 28, 2005) (holding that petitioner failed to demonstrate that counsel was ineffective where he failed to rebut Warden's

26

characterization of Texas prisons as violent institutions where murders, rapes and attacks often take place), *aff'd,* 213 Fed. Appx. 294 (5th Cir. 2001).  "Counsel cannot be deficient for failing to press a frivolous point."  *Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir. 1995).

Moreover, the Court finds that counsel's decision to refrain from making a general relevance objection falls within sound trial strategy.  It is well settled that a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).  A court will not find ineffective assistance of counsel merely because it disagrees with counsel's trial strategy.  *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir.), *cert. denied*, 528 U.S. 947 (1999).  Based upon the foregoing, the Court finds that Perez has failed to demonstrate that the State court's resolution of this claim is contrary to, or involves an unreasonable application of, clearly established federal law.

### 2.      Failure to request a limiting instruction

Perez next argues that his trial counsel rendered ineffective assistance of counsel by failing to properly request an instruction to the jury to disregard Smithey's testimony impugning Perez's good conduct in the Travis County Jail pending trial.  The State Habeas Court rejected Perez's claim finding that Perez's attorneys were not ineffective for failing to request such a limiting instruction because it was reasonable trial strategy to refrain from making any further motions after defense counsel's objection was sustained by the Court.  The Court agrees.

As discussed above, Sawyer explained in his testimony before the State Habeas Court that he failed to request a limiting instruction with regard to Smithey's comments because he felt that his objection that Smithey's testimony was "no more valuable than a wino on the streets" effectively

dealt with Smithey's irrelevant testimony.  I SHCR 159.  As noted, Sawyer testified that it would have been poor trial strategy to request a limiting instruction at this point because he had effectively discredited the witness and he did not want to further emphasize his testimony.  Perez has failed to show that his trial counsel's strategic and tactical decision not to request a limiting instruction was so ill-chosen that is permeated the entire trial with obvious unfairness.  *See Mosley v. Quarterman*, 2008 WL 5381299 at * 7 (5th Cir. Dec. 23, 2008) (counsel's failure to obtain a limiting jury instruction was reasonable trial strategy, and thus did not amount to ineffective assistance of counsel, where counsel's decision not to obtain a limiting jury instruction was made after some deliberation, based upon counsel's belief that juries did not generally understand a limiting instruction, and, instead, could believe counsel was trying to hide something), *cert. denied*, 130 S.Ct. 484 (2009).  Accordingly, Perez has failed to demonstrate that he was denied the effective assistance of counsel with regard to his claim.

### 3.     Failure to challenge future dangerousness evidence

Perez next argues that he was denied the effective assistance of counsel by his trial counsel's failure to challenge the State's future dangerousness evidence through the use of a "violence risk assessment expert."  Perez contends that the use of a violence risk assessment expert would have enabled Perez to rebut the testimony of Royce Smithey and to challenge the State's evidence that he posed a high risk of future dangerousness.  Perez contends that an expert such as Cunningham would have provided testimony that capital offenders such as Perez have a low rate of violence while in prison.  The State Habeas Court rejected Perez's claims, finding that Perez's attorneys were not ineffective for failing to offer the testimony of a violence risk assessment expert because it was a

matter of trial strategy and "such an expert would not have made any difference in the outcome of the punishment phase."  Conclusions of Law at p. 3.   The Court agrees.

First, the Court notes that the hiring of expert witnesses and the presentation of their testimony is a matter of trial strategy. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993). "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  In his testimony before the State Habeas Court, Sawyer explained that he did not believe that a violence risk assessment expert was needed in the case because he did not find Smithey to be an effective prosecution witness.  In addition, Sawyer testified that he only puts witnesses on the stand if their testimony is absolutely necessary since there is always a risk that expert testimony may elicit unfavorable testimony.  I SHCR 163.

Based upon the foregoing, the Court finds that Sawyer's decision not to offer the testimony of a violence risk assessment expert was reasonable trial strategy. *See Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007) (a decision to attack the state's expert witnesses on cross examination rather than calling additional experts can be a part of a reasonable trial strategy), *cert. denied*, 553 U.S. 1006 (2008); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998) ("[A] tactical decision not to pursue and present potentially mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance").  Perez has failed to show that his trial counsel's strategic decision not to call such an expert "was so ill-chosen that is permeated the entire trial with obvious unfairness." *Cotton*, 343 F.3d at 753.

Even if his attorneys were ineffective for failing to produce a violence risk assessment expert, Perez has also failed to demonstrate that he was prejudiced by this failure.  As noted above, the future dangerousness special issue relates to whether the defendant will commit violent criminal acts in the future so as to constitute a continuing threat to society "whether in or out of prison." *Muniz,* 851 S.W.2d 238 at 250.  While Perez's record in prison and potential for violence in prison is certainly relevant to the determination of future dangerousness, evidence related to his propensity toward violence in free society was also relevant to the jury's determination on this issue.  *See Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999) (finding that "all possible relevant information about the individual defendant" should be presented to the jury on the issue of future dangerousness), *cert. denied*, 528 U.S. 1145 (2000).  The Fifth Circuit and Texas Courts have specifically rejected the notion that a clean prison record demonstrates that a defendant is no longer a continuing threat to society.  *See McCullum v. Dretke*, 2004 WL 330868 at * 4 (5th Cir. Feb. 20, 2004); *Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000); *Evans v. McCotter*, 790 F.2d 1232, 1242-43 (5th Cir.), *cert. denied*, 479 U.S. 922 (1986); *Muniz*, 851 S.W.2d at 250. In fact, under Texas law, the facts of the crime alone may be sufficient to support the jury's affirmative finding on the future dangerousness special issue. *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000) (citing *Vuong v. State*, 830 S.W.2d 929, 935 (Tex. Crim. App. 1992)).  Thus, even if Perez's attorneys had introduced evidence suggesting that Perez would not be a threat while in prison, the jury could have relied on the facts and circumstances of the underlying murders to find that Perez would be a future danger to society.  *See Id.*  The Court has already described the extremely violent nature of the three murders in this case.  Perez was found guilty of brutally strangling and beating to death his former girlfriend, strangling nine-year old Staci

30

Mitchell, and brutally beating to death the girl's mother with a cast iron pan. The prosecution also presented evidence of Perez's flight from the scene and his attempts to cover up the homicides in the hours and days following the murders. In addition to the wanton nature of the killings, the prosecution also presented evidence of Perez's prior criminal offenses, jail time and self-confessed attempts to avoid being arrested for failing to pay child support. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (an escalating pattern of disrespect for the law supports a finding of future dangerousness). Furthermore, evidence showed that Perez expressed no remorse or emotion over the killings of his friends. *See Rachal v. State*, 917 S.W.2d 799, 806 (Tex. Crim. App. 1996) (lack of remorse may be a factor in determining future dangerousness), *cert. denied*, 519 U.S. 1043 (1996). Based upon the foregoing, the Court finds that there was sufficient evidence for the jury to find that Perez would be a continuing threat to society based on the facts and circumstances of the crime itself, Perez's lack of remorse and his behavior after the homicides.

In order to establish prejudice, Perez is required to show more than a mere possibility that counsel's errors could have affected the outcome of the trial; rather, he is required to establish a reasonable probability. *Woodfox v. Cain*, 609 F.3d 774, 809 (5th Cir. 2010). Perez has failed to demonstrate that there is a reasonable probability that but for counsel's failure to call a violence risk assessment expert to rebut Smithey's testimony, the jury would not have affirmatively answered the Special Issue. Therefore, the Court finds that it was not an unreasonable application of clearly established federal law for the State Habeas Court to conclude that Perez failed to show his counsel was ineffective for failing to proffer the testimony of a violence risk assessment expert during the punishment phase of his trial.

### 4.   Failure to call Richard Mojica as a witness

In his fifth claim of error, Perez argues that his counsel was ineffective for failing to call Richard Mojica as a witness during his trial in order to corroborate Perez's alibi defense. During the guilt-innocence phase of his trial, Perez testified that he could not have committed the murders because he had spent the day with an alleged acquaintance named Alex Gutierrez. Perez testified that he originally met Gutierrez in a public restroom when he shared some of his cocaine with Gutierrez. Perez stated that he ran into Gutierrez again on the Saturday preceding the murders, while he was having a beer with his friend, Richard Mojica, at Tovar's Bar on Cesar Chavez. Perez claims that while he and Mojica were at the bar, Gutierrez drove up to the bar in a white pick-up truck, recognized Perez and motioned for Perez to come over to Gutierrez. Perez claims that he then went up to the truck and Gutierrez handed Perez a piece of paper with his phone number on it and told him to call him some time. Perez testified that the morning of the murders, he called Gutierrez who later picked him at the convenience store and the two spent the entire day together hanging out at the park, doing a couple of drug deals, drinking, snorting cocaine and watching girls play volleyball. Despite Perez's testimony, he could not produce any evidence (such as the piece of paper with Gutierrez's phone number on it) or witnesses (such as Gutierrez or anyone who knew Gutierrez) to corroborate his story. The prosecution suggested that Gutierrez was fictitious and was invented by Perez in a weak attempt to create an alibi.

Perez now argues that his trial attorneys were ineffective for failing to call Richard Mojica as a witness during his trial in order to corroborate the existence of Gutierrez. Perez contends that Mojica would have testified that he saw Perez talk to two men in a truck on the day he and Mojica were hanging out at Tovar's Bar a few days before the murders took place. Mojica submitted an

Affidavit stating that while he did witness such a conversation, he could not identify the men in the car and could not corroborate the identity of Gutierrez.  Moreover, Mojica testified that when he asked Perez who he was talking to, Perez merely replied "a friend." Mojica Affidavit, Exhibit A to Perez's Amended Petition.

During the State Habeas Corpus Proceedings, Perez's lead trial counsel testified that he did not call Mojica as a defense witness because he did not believe that Mojica's testimony would have corroborated Perez's alibi and believed that Mojica's testimony could have opened the door to damaging impeachment evidence against Perez.  I SCRH 87.[15] The State Habeas Court held that Perez's attorneys were not ineffective for failing to offer the testimony of Mojica.  The Court reasoned that the decision was a matter of sound trial strategy.  In addition, the Court found that Perez could not demonstrate that he was prejudiced by the failure to call Mojica as a witness.

Perez has failed to demonstrate that the State Court's rulings on this issue were objectively unreasonable. As stated earlier, complaints regarding uncalled witnesses are not favored in federal habeas corpus review because "the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538.  In order to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.*  Perez fails to demonstrate ineffective assistance with regard to this claim because he cannot demonstrate that he was prejudiced

_____

[15]"SCRH" refers to the Supplemental Clerk's Record of the State Habeas Hearing, with the volume number preceding and the page number following.

by the failure to call Mojica. As demonstrated by his affidavit, Mojica's proposed testimony did not confirm Perez's alleged alibi. Mojica could not verify the existence of Gutierrez or the whereabouts of Perez on the day of the murders. *See Whitlock v. Dretke,* 129 F. App'x 880, 881 (5th Cir. 2005) (holding that state court's decision denying ineffective assistance of counsel claim did not involve an unreasonable application of *Strickland* where potential alibi witnesses were either unavailable to testify or their testimony would not have supported petitioner's alibi); *Cazier v. Thaler,* 2010 WL 518241 at *8 (W.D. Tex. Feb. 3, 2010) (holding that attorney's failure to subpoena alibi witness was not ineffective assistance of counsel where witness could not verify petitioner's presence at the time of the offenses). Moreover, trial counsel's decision to omit Mojica's testimony was clearly a matter of trial strategy since his testimony could have opened the door to unfavorable testimony. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) ("The decision whether to present a witness is considered to be essentially strategic. . ."), *cert. denied*, 131 S.Ct. 265 (2010). The State Court's ruling regarding trial counsel's decision not to call Mojica as a defense witness was not contrary to or an unreasonable application of *Strickland*.

## 5.     Failure to impeach Steve Jackson

Perez next argues his trial counsel was ineffective when he failed to impeach witness Steve Jackson with his prior inconsistent statements made before the grand jury. During Perez's trial, Steve Jackson, a friend of Perez's testified under immunity that he left some cocaine and a beeper with Perez before he left town for a few days. However, during his grand jury testimony—before he received immunity from the prosecution—Jackson denied that he gave cocaine to Perez. Perez contends that his trial counsel was ineffective for failing to impeach Jackson with these prior inconsistent statements in order to attack his credibility. The State Habeas Court ruled that Perez's

34

attorneys were not ineffective for failure to impeach Steve Jackson since the "proposed impeachment pertained to a collateral matter and would have been of dubious benefit to the applicant." The court also ruled that Perez could not show that he was prejudiced by the failure to impeach Jackson.

Perez has failed to demonstrate that the State Court's application of *Strickland* was objectively unreasonable. As Perez's attorneys testified before the State Habeas Court, whether or not Steve Jackson lied about giving the cocaine to Perez a few days before the murders is completely irrelevant to whether Perez was guilty of the murders. Perez himself admitted during his testimony that he received the cocaine from Steve Jackson with the intent to either sell it to a friend or use it himself and reimburse Jackson. 21 Tr. 106-08. Perez also testified that he and Fulwiler snorted the cocaine he received from Jackson on the night before the murders. 21 Tr. 117-19. Thus, Perez never disputed that he received the cocaine from Steve Jackson. Impeaching Jackson's testimony with statements he made to the grand jury before he had received immunity would have been pointless and irrelevant to Perez's defense in the case. *See United States v. Posada-Rios*, 158 F.3d 832, 870 (5th Cir .1998) (no right to impeach a witness with respect to collateral or irrelevant matters), *cert. denied*, 526 U.S. 1031 (1999). As Perez's lead counsel, Sawyer explained:

> It didn't matter where the cocaine came from. It didn't matter, you know, whether it was for sale, resale, or personal use. It was there and it was used. And it doesn't help the jury determine—at least in my opinion then and in my opinion now—whether or not Lou Perez committed these crimes.

I SCRH169-170.

The decision on whether or not to impeach Jackson's testimony was clearly a matter of trial strategy. A decision regarding whether to attempt to impeach a witness "is a matter which calls on counsel's professional judgment and requires him to balance a number of factors, including but not

35

limited to the relative importance of the perceived inconsistencies, the likelihood of whether a witness can explain those inconsistencies, and the possible alienation of jurors by endless disputes concerning what they may consider ultimately inconsequential and time-consuming issues." *Laugand v. Cain*, 2007 WL 3275127 at * 7 (E.D. La. Nov. 6, 2007). Thus, choices regarding impeachment are generally ones of trial strategy and are not to be second-guessed in a federal habeas corpus proceedings. *Id. See also, Mills v. Armontrout,* 926 F.2d 773, 774 (8th Cir. 1991) (holding that trial counsel's decision to refrain from impeaching witness was reasoned choice of trial strategy that was not cognizable in federal habeas corpus proceeding in context of claim of ineffective assistance of counsel). In addition, because impeaching Jackson with his prior inconsistent statements would not have aided Perez's defense, Perez cannot demonstrate prejudice. Accordingly, the State Court's ruling regarding trial counsel's decision not to impeach Jackson was not contrary to or an unreasonable application of *Strickland*.

### 6.    Failure to object to Tom Bevel's testimony

Next, Perez argues that his trial attorneys rendered ineffective assistance of counsel when they failed to object to the State's "blood splatter expert's" testimony regarding psychological matters beyond the scope of his expertise. During Perez's trial, the State offered the testimony of Tom Bevel, an expert in the field of blood stain analysis and crime scene reconstruction. 18 Tr. 96 Based upon the physical evidence at the crime scene, Bevel testified as to how the victims were killed and the probable sequence of events which occurred on the day of the murders. In addition, during his testimony, Bevel testified that certain evidence at the scene—such as covering the bodies with blankets—indicated that the killer knew the victims. Perez alleges that this "psychological

36

testimony" was outside the scope of Bevel's expertise as a blood stain analyst and crime scene reconstruction expert and, therefore, his attorneys should have objected to his testimony.

The Court of Criminal Appeals rejected Perez's claim (which was raised in his direct appeal) after finding that Bevel was "qualified as more than just a 'blood spatter expert.'" Order at p. 6. The Court found that Bevel "had specialized knowledge in many aspects of crime scene reconstruction, and therefore did not stray beyond the scope of expertise when he testified regarding the complained-of testimony." *Id.* at 7. The CCA concluded that Perez's attorneys did not render ineffective assistance of counsel by failing to make a "fruitless objection." *Id.* On review during the state habeas proceedings, the State Habeas Court agreed and found that Perez had failed to demonstrate ineffective assistance of counsel with regard to this issue.

As the CCA found, the record demonstrates that Tom Bevel's qualifications went beyond that of a mere "blood splatter expert." *Id.* at 6. Bevel had spent 27 years with the Oklahoma City Police Department, had his own forensic consulting company, had 25 years of experience in conducting technical investigations, held FBI certification in fingerprint identification, had completed the forensic science course associated with Scotland Yard, had taken a medical-legal course with the London Medical Hospital, had taken a blood-spatter course at the Central United States Police Institute, and had taught worldwide on blood-spatter analysis and crime scene reconstruction. 18 Tr. 94–96. Because of Bevel's extensive experience with crime scenes, the CCA found that Bevel did not stray beyond his area of expertise in his testimony and thus any objection to his testimony would have been futile. *Perez*, slip op. at 7.

In addition, defense counsel's failure to object to Bevel's testimony cannot be considered deficient performance because it was sound trial strategy. Mr. Sawyer testified during the habeas

state hearing that he decided to cross-examine Bevel instead of asserting a "futile objection" that a

"young lawyer" would make. I SCRH 173-77. Sawyer explained his strategy as follows:

> What I've learned from juries over the years is this: An otherwise effective expert
> if you give him a free rein and he thinks he's getting around you because you don't
> know what you're doing and you get him into making statements that he can't use his
> narrow filed of expertise to sustain will many times actually undercut not only his
> own testimony but the prosecution.

I SCRH 175. The Court finds counsel's decision not to object to Bevel's testimony falls within trial

strategy and does not constitute ineffective assistance of counsel. *See United States v. Williams*,

2003 WL 21664301 at * 1 (3rd Cir. July 15, 2003) (finding that decision to not object to detective's

testimony where attorney did not want to highlight it was a decision that falls squarely within the

"strategy deference" afforded under *Strickland*). Accordingly, the State Court's ruling regarding this

issue was not contrary to or an unreasonable application of *Strickland.*

## C.    CHALLENGE TO VENIRE MEMBER CRAIG HERTEL

In Claim Number Nine, Perez argues that the trial court erred in failing to grant his challenge

for cause to Venire Member Craig Hertel. Perez argues that Hertel's jury questionnaire shows that

he was biased in favor of imposing the death penalty "in every homicide case" and, therefore, he

should have been struck for cause. Amended Pet. at p. 83. While the trial court denied Perez's

challenge for cause, Perez's counsel was permitted to use a peremptory challenge to strike Hertel

from the panel and thus Hertel never sat on the jury in this case. 8 Tr. 99.

This Court is unable to review the merits of Perez's claim regarding Hertel because it has

been procedurally defaulted. A federal district court generally cannot review the merits of a state

prisoner's habeas petition if the claims in the petition are procedurally defaulted. *Rocha v. Thaler*,

626 F.3d 815, 820 (5th Cir. 2010), *cert. denied*, 132 S.Ct. 397 (2011). A habeas claim can be

procedurally defaulted if "the prisoner has presented the claim to the highest available state court but that court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground." *Id.* Thus, in the absence of cause for the procedural default and actual prejudice from the error, federal courts must defer to state default rules. *Wainwright v. Sykes*, 433 U.S. 72 (1977).

In the instant case, the CCA did not address the merits of Perez's claim regarding Venire Member Hertel in his direct appeal because it determined that Perez failed to preserve the issue for appellate review.  See CCA Opinon at p.2.  The CCA has held that in order to preserve error on a state trial court's denial of a challenge for cause, an appellant must demonstrate on the record that: (1) appellant asserted a clear and specific challenge for cause, (2) that he used a peremptory challenge on that juror, (3) that all his peremptory challenges were exhausted, (4) that his request for additional strikes was denied, and (5) that an objectionable juror sat on the jury. *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997) (citing *Harris v. State*, 790 S.W.2d 568, 581 (Tex. Crim. App. 1989)).  Perez failed to preserve error on the trial court's ruling regarding Hertel because Perez failed to exhaust all fifteen[16] of his peremptory challenges in this case.  Accordingly, the CCA correctly determined that Perez failed to preserve this issue for appeal and thus declined to address the issue due to Perez's procedural default. *Green,* 934 S.W.2d at 105 (holding that appellant failed to preserve issue for appeal where he only used fourteen of his peremptory strikes).

_____

[16]In a capital murder case, each side is entitled to fifteen peremptory strikes. Tex. Code Crim. Proc. Ann. art. 35.15(a).

Because the CCA declined to address the merits of Perez's claim regarding Hertel and dismissed the claim on a state-law procedural ground, "the claim has been decided on an independent and adequate state-law ground." *Rocha*, 626 F.3d at 820. Therefore, the Court is unable to address the merits of Perez's claim regarding Venire Member Hertel since he has failed to demonstrate cause and prejudice for his procedural default. *See Webb. v. Thaler*, 2010 WL 3338534 at * 4 (W.D. Tex. Aug. 23, 2010) (finding that the Texas court's finding of procedural default was an adequate and independent state ground that bars the Court from reviewing the merits of petitioner's impartial juror claim).

Even if Perez had not procedurally defaulted this claim, he has failed to demonstrate that his constitutional rights were violated by Hertel's failure to be struck for cause. The right to a fair trial under the Sixth Amendment includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1985). In a capital sentencing context, a defendant has the right to challenge for a cause a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). However, the failure to grant a meritorious challenge for cause rises to the level of a constitutional violation and warrants relief only "if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." *United States v. Webster*, 162 F.3d 308, 342 n.36 (5th Cir.) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)), *cert. denied*, 528 U.S. 829 (1999). "Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury." *Williams v. Cockrell,* 2002 WL 1940099 * 5 (5th Cir. July 25, 2002), *cert. denied*, 537 U.S. 1057 (2002). Because Perez failed to exhaust all of his peremptory challenges in this case, he has failed to show that his Sixth Amendment rights were violated in this case.

**D.    CHALLENGE TO VENIRE MEMBER FREDERICK FALBO**

Next, Perez argues that the trial court erred when it granted the State's challenge for cause to Venire Member Frederick Falbo based upon his views against the death penalty.

Prospective jurors may not be stricken for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). However, a strike for cause is appropriate, where those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424. In applying this standard, reviewing courts are to accord deference to the trial court because the judgment as to "whether a veniremen is biased. . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. *Id.* at 428. The trial court's finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Id.* at 424-425. Thus, when there is ambiguity in the prospective juror's statements, the trial court is entitled to resolve it in favor of the state. *Id.* at 434.

Furthermore, "[w]hether a juror is excludable under the *Witherspoon-Witt* standard is a question of fact." *Ortiz v. Quarterman*, 504 F.3d 492, 501 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008). Thus, the CCA's determination of such a claim "shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Therefore, the Court must examine the record in this case to determine

41

whether Perez has adduced "clear and convincing evidence" that the trial court's factual determination that Falbo should be excluded from the venire was erroneous.

During Falbo's *voir dire* examination, the prosecutor asked Falbo to explain his feelings on the death penalty.  Falbo replied as follows:

> I searched my soul and I have come to the conclusion that I would have a difficult time, you know, deciding in favor of the death of a human being.  I am not absolutely certain I couldn't, but I am at least 90 to 95 percent certain that I couldn't.  When the moment of truth came, I think I would have difficulty with that.

12 Tr. 42.  In response to the question of whether he had "conscientious scruples" against the imposition of the death penalty, Falbo responded:

> Yeah, I think so. I mean, I personally enjoy life too much to, you know, make a decision to end the life of someone else. . . . I'm a little troubled by being in a position, you know, [that] is inconsistent with the [Catholic] Church's position on that.  But my feelings go beyond that. . . . I personally have some strong feelings about it . . . .

12 Tr. 42-3.  Falbo also added that if was picked as a juror on the case he could see himself "grasping for any mitigating circumstance possible to avoid having to make that decision." 12 Tr. 43.  In response to the prosecutor's question asking Falbo, "[d]o you think that just the fact that this is a living human being is mitigation enough to give life," Falbo stated:

> You know, I spent time thinking about that one, too; and I am saying to myself, well, let me see if I can come up with a circumstance or a type of human being where I could say, well, maybe the death penalty is the right answer.  And, you know, I could get real creative and say, well, if Adolf Hitler were, you know, the defendant and I was a juror, I think I might cross the bridge then.  I don't know how to say it.  It would have to be some very extreme circumstance.

12 Tr. 43.  The prosecutor then asked Falbo whether he would hold the State to a higher burden of proof than "beyond a reasonable doubt" during the guilt/innocence phase of the trial since the defendant would be facing the death penalty, Falbo responded:

I'm not sure if I can answer the question.  On the one hand I say to myself, I think I'm—I think I would do a good job of evaluating the facts, interpreting the law properly, and making a decision based on that.  So on the one hand I can say, you know, I can  get past that.  I could get to right conclusion on whether the defendant is guilty or innocent of capital murder.  On the other hand, all right, once I'm past that, I think—I don't think I would be as—I would be the average juror when it came to the decision on death, the death penalty.

12 Tr. 46-7.  Falbo later admitted that he had a bias against the death penalty and noted that he could not think of anything in his mind that would justify the death penalty. 12 Tr. 48-9.  Regardless of what the evidence was, he stated that he doubted whether he could answer "No" on the mitigation question which would result in the death penalty.  12 Tr. 49.  Falbo further admitted that because of his strong feelings against the death penalty, he could not give the State "a fair and objective look" in the case and could not "recommend the death penalty." 12 Tr. 51.

Defense counsel then attempted to rehabilitate Falbo.  First, defense counsel asked Falbo if he could answer the question of whether the defendant would commit future acts of violence with a "yes" or "no" answer.  In response, Falbo stated "I think I could come up with a yes or no answer on that one.  I think the answer is if he is in a prison environment, I don't feel as though the person would be a continuing threat." 12 Tr. 54.  In answering defense counsel's question of whether Falbo could ever find that a defendant would be a future danger to individuals in prison, Falbo stated:

Okay, I will go along with you on that one.  I think that there could be—you know, I could get—I can't imagine one, but I think, you know, if there was evidence that supported, you know, that we're dealing with Attila of the Huns [sic], you know, there is no sense of remorse or any—anything that would suggest, you know, that this wouldn't continue, I'd be there.

12 Tr. 55.  Although Falbo earlier stated that he would not be able to objectively answer the mitigation question, he informed defense counsel that he could honestly answer the mitigation question if there was no evidence of any mitigating circumstances, but stated that he was "going to

43

work real hard on it." 12 Tr. 56.  Falbo also stated that he would be able to obey the law and answer

each jury question "honestly."  12 Tr. 56-7.

 After defense counsel finished questioning Falbo, the Court asked Falbo whether his views

on the death penalty would impair his ability to answer the questions submitted to the jury based

solely on the evidence presented in the case.  In response, Falbo stated the following:

> Now, on the question of recommending the death penalty, all I can tell you is I will
> be as honest as I can.  I will be honest and I will—and the other point I'll make is I'll
> be an advocate for whatever I believe in.  So when it gets time to deliberate on those
> questions there and the interpretation of those questions, I am going to be a strong
> advocate for whatever I believe in [opposition to the death penalty], and that may or
> may not influence the other jurors.  I suspect it will.

12 Tr. 59.

 At the end of Falbo's voir dire examination, the State challenged Falbo for cause arguing that

Falbo's views on the death penalty substantially impaired his ability to be an unbiased juror in the

case.  The trial court agreed and struck Falbo for cause. 12 Tr. 61.  The CCA upheld this ruling

finding that "the trial judge was within his discretion in determining Falbo's views on capital

punishment were such that they would have prevented or substantially impaired the performance of

his duties as a juror in accordance with his instructions and his oath."  CCA Opinion at p. 4.

 The CCA ruling on this issue was not an unreasonable application of law, as the Supreme

Court has explicitly held that "[s]uch determinations [are] entitled to deference even on direct

review; 'the respect paid such findings in a habeas proceeding certainly should be no less.'"  *Witt*,

469 U.S. at 428 (internal quotations and citations omitted).  As summarized above, Falbo gave

conflicting signals of his ability to serve on the jury given his opposition to the death penalty.  Falbo

repeatedly stated that regardless of what the evidence was in the case, he doubted whether he would

be able to answer the jury questions objectively if it would result in the defendant receiving the death penalty. *See Ortiz*, 504 F.3d at 502 (finding that juror was substantially impaired where she admitted that she could never vote to inflict the death penalty no matter what the evidence showed). However, during defense counsel's examination, Falbo testified that he would be able to honestly and objectively answer the jury questions. Finally, in answering the trial judge's question of whether his views on the death penalty would impair his ability to answer the questions submitted to the jury based solely on the evidence presented in the case, Falbo stated that he would be a strong advocate for whatever he believes in and that his views on the death penalty would likely influence the other jurors in the case. The trial judge was entitled to resolve any ambiguities in Falbo's testimony in favor of the State. *See Witt*, 469 U.S. at 434 ("the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State"); *Ortiz*, 504 F.3d at 502-03 (finding that trial court's decision to exclude juror was not erroneous even though juror gave conflicting signals of her ability to serve on the jury given her opposition to capital punishment since trial court is entitled to resolve any ambiguity based on the assessment of the juror's demeanor). As the Supreme Court reasoned, "the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen [by the trial court] below, but cannot always be spread upon the record." *Witt*, 469 U.S. at 428 n. 9. Thus, despite the lack of clarity in the printed record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id*. at 425-426.

Falbo was "the classic wavering prospective juror" who demonstrated that he was substantially impaired to serve as a juror in the case. *See Ruiz v. Quarterman,* 460 F.3d 638, 645-46

(5th Cir. 2006) (upholding state's challenge for cause of prospective juror where venire person was the "classic wavering prospective juror," first stating in her juror questionnaire her opposition to capital punishment, then stating in open court that she could follow the court's instructions on the matter, and finally testifying as to her intent to get involved in an organization working to abolish the death penalty), *cert. denied*, 549 U.S. 1283 (2007).  Based upon the foregoing, the Court finds that the Court of Criminal Appeals' decision upholding the trial court's challenge for cause for prospective juror Falbo was not contrary to or an unreasonable application of federal law.

**E.     BYSTANDER OUTBURST**

Perez next argues that the trial court erred in failing to grant his motion for a new trial after a bystander's outburst during the guilt-innocense phase of the trial.  Perez argues that the outburst interfered with the jury's verdict in the case and that his due process rights were therefore violated.

During the direct examination of one of the homicide detectives on the case, the State showed the jury a video of the crime scene.  When the video displayed the body of nine year-old victim Staci Mitchell, her father—Joe James Mitchell—rose from his seat in the gallery and rushed to the bench, screaming and yelling.  Mr. Mitchell was stopped by courtroom security officers before he reached the bench and was promptly removed from the courtroom.  14 Tr. 165.  During the disturbance, Perez was also removed from the courtroom by two uniformed officers.  After the trial judge excused the jury from the courtroom, defense counsel moved for a mistrial arguing that the bystander outburst and the jury being alerted to the fact that Perez was in custody prejudiced Perez.  The trial court denied the motion, reasoning:

> The Court's of the opinion that if there's any juror who's not aware that the defendant's in custody, the juror probably wouldn't have had the intelligence to dress themselves this morning.  But I don't think the outburst was of a sufficient magnitude

46

> to effect the jurors, especially in light of the instruction the Court shall give them and the relatively ambiguous behavior of the disorderly person.  But the Court is taking measures to ensure that there will not be a repeat of this episode, and that person has been removed from the courtroom permanently for the remainder of the trial.

14 Tr. 175-76.  The Court then informed the courtroom audience that the individual who had made the outburst had been given a criminal trespass warning and was prohibited from reentering the courtroom for the remainder of the trial.  The Court also warned the audience members that no more outbursts would be tolerated and that he would be "incarcerating any person who does this again." 14 Tr. 176.  After the jury was brought back into the courtroom, the judge directed the jurors to disregard the disruption and informed them that the individual who made the outburst had been removed from the courthouse for the remainder of the trial.  14 Tr. 176-77.

On direct appeal, the CCA applied Texas state law[17] to reject Perez's claim that the bystander outburst had prejudiced the jury and prevented him from receiving a fair and impartial trial.  The CCA reasoned the following:

> The record in the instant case shows only that the jury saw a man from the audience take off his jacket and rush toward the front of the courtroom "screaming and yelling."  There is no indication that anyone, including the jurors, understood what the man was screaming and yelling or knew that he was a relative of one of the victims.  Nor is there any indication in the record that the incident affected the jury.

CCA Opinion at p. 9.  "The failure to grant a mistrial is a matter of state law and not of a constitutional dimension and is within the sound discretion of the state trial judge." *Matthews v.*

---

[17]Under Texas law, an outburst from a bystander or witness "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability [exists] that the conduct interfered with the jury's verdict." *Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988).  In the context of such outbursts, the trial judge's instructions to the jury to disregard such outbursts are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions.  *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

*Cain*, 2010 WL 3210444 (E.D. La. July 12, 2010).  Thus, the Constitution is only implicated when the denial of a motion for mistrial results in a fundamental unfairness which fatally infected the trial or which is of such a quality that it necessarily prevents a fair trial. *Id.* (citing *Lisenba v. People of the State of Cal.*, 314 U.S. 219, 236-37 (1941)).  A petitioner must show that "there is more than a mere reasonable possibility that [the error] contributed to the verdict. It must have had a substantial effect or influence in determining the verdict." *Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir.) (emphasis omitted), *cert. denied*, 519 U.S. 854 (1996).

As described in detail above, after Mr. Mitchell's outburst during the trial, the trial judge removed Mr. Mitchell from the courtroom and instructed the jury to disregard the outburst.  Again, Mr. Mitchell did not identify himself, did not specifically target the defendant and did not explain what he was yelling or screaming about. Given this, the trial judge's instructions to the jury to disregard Mr. Mitchell's outburst were sufficient to cure any improper impact they may have had on the jury.  Further, the trial court's handling of this situation is in keeping with the procedures Texas appellate courts found to be appropriate.[18]  Based upon the foregoing, the CCA's failure to grant

---

[18]*E.g., Gamboa*, 296 S.W.3d at 580 (capital murder defendant not entitled to a mistrial based on an outburst by the victim's family member, shouting "You did this for 200 dollars?"during the testimony of a prosecution witness where trial judge instructed jury to disregard the outburst); *Brown v. State*, 92 S.W.3d 655, 661 (Tex. App.– Dallas 2002) (victim's father's outburst of "Give my son justice, please" during murder trial cured by trial judge's instructions to disregard his comment), *aff'd*, 122 S.W.3d 794 (Tex. Crim. App. 2003); *Matthews v. State*, 960 S.W.2d 750, 757 (Tex. App.-Tyler 1997, no pet.) (outburst by manslaughter victim's brother contradicting defense attorney's question about whether the victim's car stereo was on was cured by the judge's instruction to disregard). Perez has failed to demonstrate that the outburst interfered with the jury's verdict in this case or that he was denied a fair trial through the trial court's denial of the mistrial based on the outburst. *See Whitehead v. Cowan*, 263 F.3d 708, 724 (7th Cir. 2001) (holding that mother of victim's emotional outburst at petitioner—asking him why he killed victim—was not prejudicial since the fact that mother was upset communicated nothing new to jury, court specifically instructed jurors to ignore any comments they heard and evidence of guilt was overwhelming), *cert. denied*, 534 U.S. 1116 (2002); *Kinnamon v. Scott*, 40 F.3d 731, 734 (5th Cir.) (finding that allegation that victim's

relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent, and this claim thus lacks merit.

## F.    RIGHT TO REMAIN SILENT

Next, Perez complains that his Fifth Amendment rights to due process were violated when the prosecutor commented on two separate occasions during closing argument that it had taken Perez over a year to come up with his purported alibi in the case.  During the guilt-innocense phase of the trial, Perez took the stand and testified that he was completely innocent of the charges against him. Although he admitted that he had spent the night at  Fulwiler's house the night before the murders, he testified that he left Fulwiler's house the next morning and walked to a near by convenience store to meet Alex Gutierrez.  Perez testified that he could not have committed the murders because he had spent the entire day with Gutierrez.  21 Tr. 138.  During his testimony, Perez stated that the police arrested him while he was talking to his lawyer on a pay-phone at a convenience store.  Perez stated that his lawyer advised him to go with the police but "wait till I come and talk to you before you say anything." 21 Tr. 151.  In response to defense counsel's question of whether Perez had told anyone in the past year "what really happened," Perez stated:  "I have not said a word to anybody. It's been the most painful year of my life, not being able to say anything." 21 Tr. 151.

During the State's closing argument, after the prosecutor summarized the physical evidence linking Perez to the murders, he attacked the credibility of Perez's purported alibi, stating, in part, the following: "Now, let's talk about yesterday.  An amazing day.  Probably one of the most amazing

---

daughter had cried loudly in front of jury and had began screaming that the petitioner had killed her father did not show any prejudicial error of constitutional magnitude where judge was unpersuaded that this outburst had occurred and reasoned "[t]hat the young girl was upset and angry at the person accused by the state as the murderer of her father communicated nothing new to the jury, even if the incident occurred"), *cert. denied*, 513 U.S. 1054 (1994).

in my life.  Louis Perez got on the stand, got the chance to tell his story.  A story it's taken him a year

to come up with." 22 Tr. 79.  Defense counsel then objected to the prosecutor's comments, but the

trial court overruled the objection.  The prosecutor then continued to attack Perez's alibi and noted

that it was "incredible" that Perez and his defense team were unable to locate the "mysterious" Alex

Gutierrez in over a year.  22 Tr. 81.  The prosecutor further argued that Perez did not go to his

parents' house after he allegedly discovered the body of Cinda Barz because he was afraid that his

mother would realize that he was guilty of the murders:

> Why doesn't he go home?  Because he told you why he didn't go home.  Because his
> mom can see straight through him.  His mom would have known what he had done.
> If all he had done was walk in on a horrible scene, what do we care if mom knows?
> That's where you go, to someone to help you.  But his mom would have known that
> he had just brutally murdered two women and a girl.
>
> And you know what? This story up here, this was for mom.  This story wasn't for
> you.  This story was for mom.  Because he can't admit to her what he has done.
>
> What he's done is *he's worked for a full year on making up a story to fit the
> evidence.*

22 Tr. 85-86 (emphasis added).  At this point, defense counsel again objected arguing that "[t]he

prosecutor's continued inference that the defendant has worked for a year" to come up with his alibi

violated Perez's Fifth Amendment rights.  The trial court overruled the objection stating that "[t]he

Court heard no such implication and will overrule the objection." 22 Tr. 86.

In the direct appeal, the CCA upheld the trial court's ruling finding that there was no Fifth

Amendment violation because "[t]he prosecutor's remarks were merely a summation of and

reasonable deduction drawn from [Perez's] testimony." CCA Opinion at p. 10.

In support of his claim, Perez relies on the Supreme Court decisions of *Griffin v. California*,

380 U.S. 609 (1965) and *Doyle v. Ohio*, 426 U.S. 610 (1976).  Perez's reliance on these opinions,

however, is misplaced.  In *Griffin*, the Supreme Court held that the trial court's and the prosecutor's comments on the defendant's failure to testify violated the self-incrimination clause of the Fifth Amendment.  The defendant in the case, who was accused of murder in the first degree, did not testify during the guilt phase of the trial.  During the prosecutor's closing argument to the jury, the prosecutor implied that the defendant's failure to testify was evidence of his guilt.  The trial court also instructed the jury that it was free to take the defendant's failure to testify as tending to indicate the truth of the prosecution's case.  The Court found that these comments violated the defendant's Fifth Amendment rights, noting that allowing

> comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws (citation omitted). It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. . . .  What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another.

*Id.* at 614.  The Court thus held "that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. at 615.

The other case Perez relies upon is *Doyle v. Ohio,* where the Supreme Court addressed whether a state prosecutor may impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest.  In *Doyle* the defendants were arrested for selling marijuana, were given their *Miranda* warnings and chose to remain silent.  At trial, however, the defendants took the stand and gave an exculpatory story—one they had not previously told police—that they had been framed.  Over an objection, they were cross-examined as to why they had

not given the arresting officer the exculpatory explanations.  On appeal, the defendants argued that it was error to allow the prosecutor to question them about their post-arrest silence.  The Supreme Court reversed the defendants' convictions, holding that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619.  The Court explained that

> while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 618.  However, the Court declined to hold that post-arrest silence *could never* be used against a defendant:

>  It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Id.* at 619 n. 11 (*citing United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975)).

Similarly, in *United States v. Robinson*, 485 U.S. 25 (1988), the Supreme Court rejected the defendant's view that any direct reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed by *Griffin*.  In *Robinson*, defense counsel had urged several times during his closing argument that the Government had not allowed the defendant—who did not testify—to explain his side of the story and had unfairly denied him the opportunity to explain his actions.  The prosecutor objected to these remarks and argued that the defense had "opened the door" to commenting upon the defendant's failure to testify.  The trial court agreed and

permitted the prosecution to point out during its rebuttal summation that the defendant "could have taken the stand and explained it to you," but failed to do so. *Id.* at 28.  Although defense counsel did not object to the state's closing, the trial court included in the jury instructions an admonition that "no inference whatever may be drawn from the election of a defendant not to testify." *Id.* at 28-29. The Supreme Court held that "the prosecutor's statement that respondent could have explained to the jury his story did not in the light of the comments by defense counsel infringe upon respondent's Fifth Amendment rights." *Id.* at 31.  In so holding, the Court distinguished the case from *Griffin* and noted that any "direct" reference by the prosecutor to the failure of the defendant to testify does not necessarily violate the Fifth Amendment:

> *Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt. In the present case it is evident that the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case. Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor' reference to the defendant' opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.

*Id.* at 32.

In *Portuondo v. Agard*, 529 U.S. 61 (2000), the Supreme Court again refused to extend its holding in *Griffin* to a case involving prosecutorial challenges to the defendant's credibility.  The defendant in *Portuondo,* took the stand after the victim had testified that he had assaulted, raped and sodomized her.  The defendant denied the charges and claimed that he had engaged in consensual intercourse with the victim.  During her closing argument, the prosecutor focused on the credibility

of the witnesses and pointed out that the defendant had the benefit of hearing all of the witnesses

testify in the case before he had to take the stand to present his side of the story:

> You know, ladies and gentlemen, unlike all the other witnesses in this case the
> defendant has a benefit and the benefit that he has, unlike all the other witnesses, is
> he gets to sit here and listen to the testimony of all the other witnesses before he
> testifies.
>
> * * *
>
> That gives you a big advantage, doesn't it. You get to sit here and think what am I
> going to say and how am I going to say it? How am I going to fit it into the evidence?
>
> * * *
>
> He's a smart man. I never said he was stupid. . . . He used everything to his advantage.

*Id.* at 64.  The Supreme Court rejected the defendant's arguments that the prosecutor's comments

violated his Fifth and Sixth Amendment rights to be present at trial and confront his accusers, and

his Fourteenth Amendment right to due process.  In so finding, the Court distinguished the case from

*Griffin*, pointing out that "*Griffin* prohibited comments that suggest a defendant's silence is

'evidence of *guilt*.'" *id*. at 69 (quoting *Griffin*, 380 U.S. at 615), whereas the prosecutor's comments

"concerned respondent's credibility as a witness, and were therefore in accord with our longstanding

rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony

assailed like that of any other witness,'" *Id.* at 69 (quoting *Brown v. United States*, 356 U.S. 148, 154

(1958)). Thus, [o]nce a defendant takes the stand, he is 'subject to cross-examination impeaching

his credibility just like any other witness.'" *Id.* at 70 (quoting *Jenkins v. Anderson*, 447 U.S. 231,

235-236 (1980)).  The Court reasoned:

> In sum, we see no reason to depart from the practice of treating testifying defendants
> the same as other witnesses. A witness's ability to hear prior testimony and to tailor
> his account accordingly, and the threat that ability presents to the integrity of the trial,
> are no different when it is the defendant doing the listening. Allowing comment upon

54

the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.

*Id.* at 73.  Thus, the Court found that the prosecutor's comments did not violate the defendant's Fifth and Sixth Amendment rights, or his due process rights.

Based upon the foregoing Supreme Court precedent, the Court finds that the prosecutor's comments to the jury in this case regarding the time it took Perez to come up with his alibi did not violate his Fifth Amendment rights or due process rights under the Fourteenth Amendment.  First, the Court notes that Perez himself "opened the door" to the prosecutor's comments when he testified that his lawyer had advised him not talk to the police and added that the past year had been the most "painful year of his life" since he had not been "able to say anything." 21 Tr. 151.  As the Supreme Court pointed out in *Robinson*, the Fifth Amendment  is not violated when the prosecutor's comments are made in "a fair response to a claim made by defendant or his counsel." 485 U.S. at 32.  Where the defendant has "opened the door" respecting his post-arrest silence, "'he discard[s] the shield which the law had created to protect him' from comment on his post-arrest silence." *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) (quoting *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975)).  Thus, it was not a violation of Perez's constitutional rights for the prosecutor to have commented on Perez's own testimony that he had not told anyone his side of the story for a year.[19]

---

[19] *See also Martinez-Larraga*, 517 F.3d at 268-69 (holding that prosecutor's rebuttal argument that the jury had "heard the agents" testify that the defendants were warned under *Miranda* and the defendants had made no statements was a fair response to defense counsel's argument that there was no evidence defendants knew what were in the bundles they were carrying); *Fairchild*, 505 F.2d at 1383 (holding that evidence of defendant's *Miranda* silence was admissible for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with law

Moreover, the prosecutor did not comment on Perez's Fifth Amendment right *not to testify*, but rather, was addressing Perez's *credibility* as a witness.  As the *Portuondo* Court pointed out, once a defendant takes the stand in his own defense, he is subject to cross-examination on his credibility just like any other witness.  *See Portuondo*, 529 U.S. at 70.  Thus, when Perez voluntarily took the stand in order to testify, he placed his credibility in issue in the case and it was fair for the prosecutor to comment on his credibility during closing argument.  The prosecutor simply argued that Perez's alibi was not credible and pointed out that he had over a year to come up with the story. The prosecutor did not mention whether Perez was interrogated or whether he invoked his right to remain silent after he was given his *Miranda* warnings.  Instead, the prosecutor merely commented on Perez's credibility as a testifying witness, and therefore the comments did not violate Perez's constitutional rights.[20]

---

enforcement); *Edelbacher v. Galaza,* 2007 WL 677222 at * 28 (E.D. Cal. March 1, 2007) (upholding state court's finding that prosecutor's reference to pretrial silence to impeach the defendant's alibi defense did not violate the defendant's Fifth Amendment rights where defendant himself testified on direct examination that he had been advised by his attorney not to discuss case the case).

[20]*See also Nguygen v. Felker,* 2009 WL 1246693 at * 12 (N.D. Cal. May 5, 2009) (finding no *Doyle* error where prosecutor argued in his closing argument that defendant had two years to come up with his alibi where comments concerned defendant's credibility as a testifying witness, and not his silence); *Depree v. Thomas,* 946 F.2d 784, 793 (11th Cir. 1991) (finding that prosecutor's comments that defendant failed to come forward with complete alibi story earlier did not violate defendant's Fifth Amendment rights where defendant's testimony regarding his alibi "invited the prosecutor's comments" and the prosecutor did no more than argue directly from defendant's own testimony that he did not relate his entire alibi to the police); *McCarty v. Palmer,* 2010 WL 3885606 at * 8 (W.D. Mich. July 28, 2010) (finding that prosecutor's comments that petitioner had 15 months to review police reports to come up with an alibi were not improper since prosecution could comment on defendant's credibility where he took the stand); *United States v. Fierro*, 2001 WL 1910586 at * 2 (W.D. Tex. July 5, 2001) (holding that prosecutor's comments during closing argument that defendant – who had testified in his own defense – had five months in which to review the evidence and to conform his testimony to that evidence were permissible since were comments were directed at the defendant's credibility).

Based upon the foregoing, the CCA's determination on this issue was not contrary to or an unreasonable application of federal law as established by the Supreme Court.

## G.    PAROLE ELIGIBILITY

Next, Perez argues that the trial court's refusal to provide a requested jury instruction regarding parole eligibility violated Perez's due process rights under the Fourteenth Amendment. Perez concedes that, while the trial court declined to give the requested instruction, he did permit the defense to inform the jury that there was a 40 year mandatory minimum period of imprisonment before a person sentenced to life imprisonment was eligible for parole.  *See* 23 Tr. 60.  Further, defense counsel took advantage of this permission, and informed the jury that a sentence of life imprisonment would mean "send[ing] Louis to prison for forty calendar years instead of to death row."  *Id.* at 72.   Perez complains that the trial court should have instructed the jury that if he was sentenced to life in prison, under Texas law at the time, he would have been required to serve a mandatory forty years in prison before being eligible for parole.[21]   In support of this claim, Perez relies upon the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994).  In *Simmons*, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156.  The Court reasoned that "[t]he

---

[21]It should be noted that at the time of Perez's trial, Texas law required any person serving a life sentence to serve at least 40 years before becoming eligible for parole.  Under current Texas law, which is inapplicable here, life without parole is now the alternative sentence to a death sentence. See TEX. CODE CRIM. PROC. Ann. art. 37.071.

State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id*. at 171.

A few years after its holding in *Simmons*, the Court clarified that "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000). In *Ramdass*, the Court explained that the dispositive fact in *Simmons* was that the defendant conclusively established his parole ineligibility under state law at the time of his trial. *Id.* at 171. The Court found that a *Simmons* instruction would not have been appropriate in the case before it because the petitioner was not "ineligible for parole" at the time of his sentencing as was the case in *Simmons*. Thus, the Court ruled that the *Simmons* "parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Id*. at 166. The Court further explained its reasoning for not extending its holding in *Simmons* to cases where the defendant was not ineligible for parole at the time of sentencing:

> If the *Simmons* rule is extended beyond when a defendant is, as a matter of state law, parole ineligible at the time of his trial, the State might well conclude that the jury would be distracted from the other vital issues in the case. The States are entitled to some latitude in this field, for the admissibility of evidence at capital sentencing was, and remains, an issue left to the States, subject of course to federal requirements, especially, as relevant here, those related to the admission of mitigating evidence.

*Id.* at 169.

Unlike the South Carolina sentencing scheme at issue in *Simmons*, the Texas death penalty statutes under which Perez was sentenced did not offer life imprisonment without parole as a possible sentence. Instead, the law provided only for sentences of death or life imprisonment with

the possibility of parole.  The Fifth Circuit has repeatedly refused to interpret *Simmons* to require

trial courts to instruct Texas juries to be informed of a defendant's future parole eligibility.[22]  Based

on this precedent, the *Simmons* rule does not apply to the facts of this case since Perez would have

been eligible for parole at the time he was sentenced.  Accordingly, the CCA's ruling that the trial

court did not err in refusing to instruct the jury on parole eligibility was not contrary to or an

unreasonable application of federal law as established by the Supreme Court.

## H.    ALLEGATION OF ACTUAL INNOCENCE

Next, Perez alleges that he is actually innocent of the offense of capital murder.  There are

several flaws in this claim.

First, Perez failed to exhaust this claim in state court.  "A fundamental prerequisite to federal

habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal

collateral relief."  *Smith v. Dretke*, 422 F.3d 269, 275 (5th Cir. 2005).  The exhaustion requirement

is satisfied when the substance of the federal habeas claim has been fairly presented to the highest

state court.  *Id*.  Thus, a petitioner cannot present new legal theories or new factual claims in his

federal application.  A federal habeas petition should be dismissed if state remedies have not been

---

[22]*See e.g.*, *Cantu v. Quarterman,* 2009 WL 2447702, at *3 (5th Cir. Aug. 11, 2009) (noting that "this circuit has repeatedly refused to apply *Simmons* so as to require that Texas juries be informed of a defendant's future parole eligibility."), *cert. denied*, 130 S.Ct. 2102 (2010);  *Johnson v. Quarterman,* 2008 WL 4441918, at *4 (5th Cir. Oct. 2, 2009) (finding that *Simmons* rule "does not apply to this case because under Texas law Petitioner would have been eligible for parole."), *cert. denied*, 129 S.Ct. 1583 (2009); *Thacker v. Dretke*, 396 F.3d 607, 617 (5th Cir.) ("Thus, settled precedent makes pellucid the reasonableness of the state court's rejection of [petitioner's] argument that *Simmons* and its progeny require that he be able to raise parole eligibility with the jury."), *cert. denied*, 546 U.S. 840 (2005); *Wheat v. Johnson*, 238 F.3d 357, 362 (5th Cir.) (finding *Simmons* inapplicable to the Texas sentencing scheme), *cert. denied*, 532 U.S. 1070 (2001); *Miller v. Johnson*, 200 F.3d 274, 290 (5th Cir.) ("[B]ecause Miller would have been eligible for parole under Texas law if sentenced to life, we find his reliance on *Simmons* unavailing."), *cert. denied,* 531 U.S. 849 (2000).

exhausted as to all of the federal court claims. *Id.*; *see also,* 28 U.S.C. § 2254(b)(1)(A) (writ shall not be granted unless it appears that the applicant has exhausted state remedies). Because Perez failed to present his actual innocence claim to the state habeas court, he is barred from pursuing the claim here.

Second, the Fifth Circuit has "specifically rejected the argument that a showing of actual innocence would warrant habeas relief absent a constitutional violation." *Foster v. Thaler*, 2010 WL 924885 at * 3 n. 3 (5th Cir.), *cert. denied*, 131 S.Ct. 822 (2010) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001)).[23] The Circuit has noted the Supreme Court's statement in *Herrera v. Collins*, 506 U.S. 390 (1993), that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," *Id.* at 417, but because the Court has not officially recognized a freestanding claim of actual innocence as a proper basis for a habeas petition, the Circuit has declined to recognize such a claim. *See also House v. Bell*, 547 U.S. 518, 555 (2006) (declining to resolve "the question left open in *Herrera*" by deciding whether freestanding innocence claims are possible,

---

[23]Perez is not arguing actual innocence in order to present a defaulted constitutional claims. Rather, he is arguing that he is entitled to habeas relief because he is actually innocent of the capital offense. The Fifth Circuit has, to date, rejected such freestanding actual innocence claims. *See Dowthitt,* 230 F.3d at 741; *Graham v. Johnson,* 168 F.2d 762, 788 (5th Cir. 1999), *cert. denied*, 529 U.S. 1097 (2000); *Creel v. Johnson,* 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999). As the Supreme Court has explained, [c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400. This rule is grounded in the principle that federal habeas courts "sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.*

noting that "whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it.").

Moreover, even if the language in *Herrera* could be read to permit a freestanding innocence claim, Perez would not be entitled to relief. *Herrera* specifically noted that for actual innocence to be a proper basis for a habeas claim, there must be "no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. Texas does have an avenue in which to pursue such actual innocence claims. *See State ex. rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398-99 (Tex. Crim. App. 1994) (holding that actual innocence could be a basis for state habeas relief where a petitioner established as a threshold that newly discovered evidence, if true, created a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict). *See also, Graham*, 168 F.3d at 788 (noting that hypothetical *Herrera* claim would not apply to petitioner since he had a state avenue open to process his claim—a petition to the Texas Board of Pardons and Paroles for clemency).

Finally, even if Perez were able to climb over each of these obstacles, he simply has failed to present a colorable claim of actual innocence. As noted in the factual summary above, the State presented a persuasive case of guilt here, and Perez has done little to undermine confidence in the jury's verdict based on that evidence. He has further failed to present the Court with any "new evidence" to support his actual innocence claim.

For all of these reasons, Perez's request for relief based on his claim of actual innocence should be rejected.

## I.      REQUEST FOR NEW DNA INVESTIGATION

Lastly, Perez argues that the DNA investigation into his case needs to be entirely redone because of "new and expanding technology." Perez alleges that there were numerous DNA samples

which were found at the murder scene that did not match any known individuals.  Perez contends

that these samples should be run through the national CODIS database.  The Court has already ruled

on this matter in its Order denying Perez's Request for Discovery.  *See* Order issued August 19,

2010.  Accordingly, this claim is now moot.

## V.  RECOMMENDATION

In summary, Petitioner has failed to demonstrate that the State court's adjudication of any

of his claims "resulted in a decision contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court of the United States; or resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." Accordingly, this Court RECOMMENDS that the District

Court DENY Louis Castro Perez's Amended Petition for Writ of Habeas Corpus (Clerk's Docket

No. 15) under 28 U.S.C. § 2254.

## VI.  WARNING

The parties may file objections to this Report and Recommendation.  A party filing

objections must specifically identify those findings or recommendations to which objections are

being made.  The District Court need not consider frivolous, conclusive, or general objections.

*Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).  A party's failure to file

written objections to the proposed findings and recommendations contained in this Report within

fourteen (14) days after the party is served with a copy of the Report shall bar that party from de

novo review by the district court of the proposed findings and recommendations in the Report and,

except upon grounds of plain error, shall bar the party from appellate review of unobjected-to

proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C.

§ 636(b)(1)(C) (2006);  *Thomas v. Arn*, 474 U.S. 140, 150–153 (1985);  *Lisson v. O'Hare*, 326 F. App'x 259, 260 (5th Cir. 2009).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 29th day of December, 2011.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE